UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| CORY LAMON CHENAULT, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | No. 5:18-CV-475-REW |
| v. | ) | |
| | ) | OPINION & ORDER |
| THE UNIVERSITY OF KENTUCKY, *et al*., | ) | |
| | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

*** *** *** ***

Appellant Cory Chenault, proceeding without counsel, appeals from the Bankruptcy Court's dismissal of his adversary proceeding against Appellees University of Kentucky d/b/a UK Healthcare and Central Kentucky Management Services, Inc. (hereinafter "UK" collectively), related to his Chapter 7 bankruptcy proceedings. *See* DE 2 (Notice of Appeal), at 1, DE 2-4 (Dismissal Order). Appellees elected to proceed on appeal before this Court, rather than the Bankruptcy Appellate Panel. DE 2-1 (Election). The matter has been fully briefed. DE 8 (Appellant's Brief) & DE 10 (Appellees' Brief). For following reasons, the Court **AFFIRMS** the Bankruptcy Court's dismissal.

I.      BACKGROUND

On July 19, 2017, Plaintiff-Appellant Chenault filed a *pro se* Chapter 7 Petition in the United States Bankruptcy Court for the Eastern District of Kentucky. *In re Chenault*, No. 17-51449-GRS (Bankr. E.D. Ky. Jul. 19, 2017), ECF No. 1 [hereinafter *Bankruptcy Proceeding*]. As part of the bankruptcy proceedings, Chenault filed two adversary proceedings, including one against Appellees that led to the instant appeal. *See Chenault v. Central Kentucky Management*

*Servs. Inc. and UK Healthcare Hospitals (In re Chenault)*, No. 17-5024-GRS (Bankr. E.D. Ky. Dec. 20, 2017), ECF No. 1 [hereinafter *Adversary Proceeding*]; *Bankruptcy Proceeding*, ECF No. 22.[1]

Prior to filing the bankruptcy petition, Chenault was in an automobile accident on November 19, 2015. He received related treatment at Defendant UK Healthcare on November 20, 2015, incurring charges totaling $23,427.53. *See Adversary Proceeding*, ECF No. 1, Exhibit B (State Farm Explanation of Review). After some time, UK Healthcare Hospitals utilized its debt collection partner, Co-Appellant Central Kentucky Management Services, to initiate collection efforts against Chenault. Though the record does not fully explain those collection efforts, apparently the Kentucky Revenue Department began garnishing Chenault's wages around April 2017, collecting, according to Chenault, less than $5,000. *See* DE 10-3 (Hearing Transcript), at 23; *Adversary Proceeding*, ECF No. 30 (Response), at 3. Chenault indicates he filed for bankruptcy primarily to stop the wage garnishment efforts. *See* DE 8 at 10. The § 341 meeting of creditors occurred on August 22, 2017, with no creditors attending. Around this time, Chenault heard from his auto insurance provider, State Farm, regarding insurance (Kentucky PIP) proceeds totaling almost $10,000.[2] On August 22, 2017, State Farm, via letter to Chenault, indicated that "[t]he Personal Injury Protection Benefits limits have been exhausted . . . . and final payment was made on 8/22/2017." *Adversary Proceeding*, ECF No. 22-2 (Exhibit B). The

---

[1] The second adversary proceeding sought student loan discharge. *See Chenault v. Great Lakes Higher Education (In re Chenault)*, No. 17-05015-GRS (Bankr. E.D. Ky. Aug. 22, 2017), ECF No. 1; *Bankruptcy Proceeding*, ECF No. 16. The Bankruptcy Court dismissed the adversary proceeding under 12(b)(6) for failure to state a claim and the Bankruptcy Appellate Panel affirmed. *See id*. at ECF Nos. 31 & 48.

[2] Chenault alleged insurance proceeds totaled $10,000 in his Complaint. However, the Bankruptcy Court concluded, and this Court agrees, that the record indicates the actual amount was $9,800. *See Adversary Proceeding*, ECF No. 28 (Answer) at ¶ 10.

check went to UK Healthcare. On August 30, 2017, per Chenault, Central Kentucky Management cashed the $9,800 insurance proceeds check. *Id*., ECF No. 22-3 (Exhibit C).

The Bankruptcy Court entered an Order of Discharge in the Chapter 7 case on November 5, 2017. On December 20, 2017, Appellant filed the instant *Adversary Proceeding,* arguing Appellees' act of accepting the sum (and cashing the check) from State Farm constituted a violation of the automatic stay. After issues with service, and Chenault's unsuccessful attempt at securing a default judgment, UK filed its Answer and Motion to Dismiss under Rule 12(b)(6) on May 29, 2018. *Adversary Proceeding*, ECF Nos. 28 (Answer) & 29 (Motion). Chenault responded. *Id*., ECF No. 30 (Response). The Bankruptcy Court held a hearing on June 28, 2018, *id*., ECF No. 31, and, subsequently granted UK's motion, *id*., ECF No. 34.[3] Chenault timely filed notice of his intent to appeal, and UK elected to appeal to this Court.

For the following reasons, the Court **AFFIRMS** dismissal.

II.     STANDARD

Pursuant to 28 U.S.C. § 158(a)(1), this Court has jurisdiction to review final orders entered by the Bankruptcy Court under 28 U.S.C. § 157. This Court reviews de novo the Bankruptcy Court's ruling on a Fed. R. Bankr. P. 7012(b) motion to dismiss.[4] *In re Cannon*, 277 F.3d 838, 849 (6th Cir. 2002) (both circuit courts and district courts review a bankruptcy court's decision from "essentially the same position," which requires de novo review of conclusions of law); *see also Hughes v. Sanders*, 469 F.3d 475, 477 (6th Cir. 2006). The Bankruptcy Court granted UK's motion to dismiss, finding that Chenault had "not plead sufficient facts in the Complaint to state a plausible claim that a violation of the stay occurred" even after being "given

_____

[3] Chenault then moved the court to reconsider its judgment on the basis of newly discovered information. The Bankruptcy Court's treatment of that motion is not before this Court on appeal.
[4] Rule 12(b)(6) is applicable to an adversary proceeding through Rule 7012(b).

the opportunity to provide additional argument and explain the basis for his Complaint." DE 2-4 (Dismissal Order). The Federal Rules of Civil Procedure require that pleadings, including complaints, contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy this requirement, a complaint must contain enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1960 (2007). A complaint may be deficient for failure "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Even though a "complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S. Ct. at 1964 (citations omitted).

On a Rule 12(b)(6) motion to dismiss, "all [well-pleaded] factual allegations in the complaint must be presumed to be true" and the court must draw all "reasonable inferences" in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted); *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007). To that end, a court must judge the sufficiency of a complaint under a two-pronged approach: (1) disregard all "legal conclusions" and "conclusory statements"; and (2) determine whether the remaining "well-pleaded factual allegations," accepted as true, "plausibly give rise to entitlement to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). Accordingly, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. (citing *Twombly*, 127 S. Ct. at 1955). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 1949. That is, the plaintiff's "[f]actual allegations must be enough to

raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 127 S. Ct. at 1959 (internal citations omitted). If, from the well-pleaded facts, the court cannot "infer more than the mere possibility of misconduct, the complaint has alleged—but has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)). The Bankruptcy Rules import the same standard in an adversary proceeding. *See* Rule 7012(b); *In re HNRC Dissolution Co.*, 585 B.R. 837, 841 (B.A.P. 6th Cir. 2018), *aff'd*, 761 F. App'x 553 (6th Cir. 2019) ("[W]hen reviewing the order dismissing [debtor's] adversary complaint, the Panel must construe that complaint in the light most favorable to [the debtor] and accept its allegations as true, drawing all reasonable inferences in [debtor's] favor.").

Pleadings and documents filed by *pro se* litigants are to be "liberally construed," and a "*pro se* complaint, however inartfully pleaded, must be held to a less stringent standard than formal pleadings drafted by lawyers." *Erickson*, 127 S. Ct. at 2200 (quoting *Estelle v. Gamble*, 106, 97 S. Ct. 285, 292 (1976)). However, "the lenient treatment generally accorded to *pro se* litigants has limits." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir.1996) (citing *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir.1991)). The basic pleading essentials persist in pro se cases. *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir.1989). A *pro se* complaint must still "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Barnett v. Luttrell*, 414 F. App'x. 784, 786 (6th Cir.2011) (quoting *Iqbal*, 129 S. Ct. at 1950) (internal quotations and emphasis omitted).

The Court reviews Judge Schaaf's analysis de novo. He found Chenault's complaint deficient under Rule 12(b)(6) and, based on his searching inquiry at a lengthy hearing, determined that amendment would be futile.[5] This resulted in dismissal and the ensuing appeal.

III.    ANALYSIS

The Bankruptcy Court correctly dismissed Chenault's adversary proceeding for failure to state a claim under Fed. R. Civ. P. 12(b)(6), made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7012(b). Specifically, the Bankruptcy Court made legal findings, determining (1) that Kentucky law does not give Chenault an interest in the insurance proceeds paid to UK, (2) that "the benefits at issue were never property of the estate[,]" (3) that, in turn, "neither defendant violated the automatic stay by taking possession of the funds," and that (4) Chenault's lack of damages foreclosed the need for amendment. The Court finds it determinative that the insurance proceeds—under the circumstances alleged by Chenault—were not property of the estate.

In his appeal, Chenault advances three "points." DE 8 (Brief). First, "whether [UK], by obtaining, possessing, and collecting a check in the amount of $9,800 from the Appellant's automobile insurance company (State Farm)," violated the automatic stay. *Id*. at 2. Second, "whether [UK's use] of the Commonwealth of Kentucky Department of Revenue Division of Collections, to seize . . . collect debt from [Chenault should be] deemed to be illegal and not eligible to use the Revenue Department as Collection Agency." *Id*. And, third, that UK's "collection of property under the <u>name</u> and/or estate that [Chenault] has interest in while in

---

[5] This Court "reviews the denial of a motion to amend under the abuse-of-discretion standard, unless the motion was denied because the amended pleading would not withstand a motion to dismiss, in which case the standard of review is de novo." *Parchman v. SLM Corp*., 896 F.3d 728, 736 (6th Cir. 2018) (quoting *Beydoun v. Sessions*, 871 F.3d 459, 464 (6th Cir. 2017) (citation, internal quotation marks, and alteration omitted)).

Chapter 7 Bankruptcy process, comes as [a] violation of Bankruptcy Code and Due Process of Law." *Id*. at 3 (emphasis in original).

The Court, for various reasons, declines to consider the second argument, raised for the first time on appeal, and without a sufficient jurisdictional basis, and consolidates the first and third[6] arguments in its analysis of the core question of this case: did UK violate the automatic stay by accepting PIP insurance proceeds? The Court finds that no stay violation plausibly occurred because, under the specific circumstances as pleaded in this case, the insurance proceeds were not property of the bankruptcy estate. Further, even had Chenault pleaded valid entitlement to the insurance proceeds—potentially making the proceeds estate property—he failed to sufficiently allege the *willfulness* and damages necessary to sustain a stay violation claim. This also substantiates Judge Schaaf's denial of leave to amend. Chenault made no amendment request at the hearing; he had cursorily sought leave to amend in the underlying briefing. *See, e.g.*, DE 30 at 6 ("or alternatively amend the complaint"). Judge Schaaf inaccurately said otherwise, DE 2-4 at 5, but he analyzed the potential for a plausible amendment nonetheless.

### A. Automatic Stay Violation

Chenault argues UK violated the automatic stay by both receiving and cashing the State Farm insurance proceeds. The Complaint itself says little, simply setting out dates of case filing, the creditor meeting, and the sequence of payment. However, the attachments, properly

---

[6] While this argument also largely appears for the first time on appeal, Chenault made references to due process violations at the oral hearing on the motion to dismiss, and so the Court considers it under *pro se* leniency. Namely, Chenault argued Defendants violated due process at the § 341 creditors' meeting by not appearing. The Bankruptcy Court considered and rejected the argument when considering whether amendment could cure the complaint deficiencies. Because complaint amendment is relevant, although tangentially, to review, this Court will consider the argument.

considered in this context,[7] bolster the facts. The materials show Chenault is alleging that State Farm paid $9,800 in PIP benefits to UK, for 2015 medical services, during the bankruptcy. Does this allege a stay violation?

Upon the filing of a debtor's bankruptcy petition, an automatic stay arises, which precludes creditors from taking almost any action to obtain property of a debtor's estate or to collect from a debtor upon a prepetition debt outside the bankruptcy process. 11 U.S.C. § 362(a). The automatic stay is among the most fundamental debtor protections in bankruptcy law, and its scope in protecting debtors and debtor property is broad. *Easley v. Pettibone Michigan Corp*., 990 F.2d 905, 910 (6th Cir. 1993); *Lynch v. Johns-Manville Sales Corp*., 710 F.2d 1194, 1197 (6th Cir. 1983). In his adversary complaint, Chenault alleges a violation of the automatic stay under § 362(a) and an entitlement to damages under § 362(k).[8] *See Adversary Proceeding*, ECF No. 22 at 2. The at-issue conduct, here, potentially fits into two categories of stay proscribed activity. Subsection (a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C § 362(a)(3). Subsection (a)(6) prohibits "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a)(6). Section 362(k) provides automatic stay damages: "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k).

---

[7] "[A] court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *See, e.g.*, *Stein v. HHGREGG, Inc.*, 873 F.3d 523, 528 (6th Cir. 2017).

[8] Chenault also cites to § 362(h) in his Complaint, but the Court sees no argument invoking that provision, which addresses steps required by a debtor to commit personal property to property of the bankruptcy estate, thereby securing automatic stay protection.

Chenault alleges that a violation of the stay occurred when UK received the insurance proceeds check on August 22, 2017 and cashed that check on August 30, 3017, both events occurring after Chenault filed bankruptcy (July 19, 2017) but prior to discharge (November 3, 2017). *Adversary Proceeding*, ECF No. 22 at 2-3. Chenault alleged he suffered "significant emotional harm as a result" and that he is entitled to compensatory damages, punitive damages, and costs, as well as attorney's fees. *Id*. at 3-4. To be a violation of the automatic stay, here, the targeted asset must be property of the estate. 11 U.S.C. § 362(a)(3). Chenault's alleged automatic stay violation is implausible and thus fails (without reaching the scienter or damages requirements) because the at-issue insurance proceeds were not property of the estate.

### B.  Insurance Proceeds as Property of the Estate

Section 541 defines "Property of the Estate." It provides, in pertinent part:

> The commencement of a [bankruptcy] creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> (1) [A]ll legal or equitable interests of the debtor in property as of the commencement of the case.
>
> . . .
>
> (6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.
>
> (7) Any interest in property that the estate acquires after the commencement of the case.

11 U.S.C. § 541(a)(1), (a)(6), and (a)(7). Congress intended a broad meaning. *See United States v. Whiting Pools, Inc*., 103 S. Ct. 2309, 2313 (1983). However, "[t]he estate's legal and equitable interests in property rise no higher that those of the debtor." *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117 (3rd Cir.1993) (finding that proceeds of credit life insurance policy were property of creditor beneficiary of policy, and not property of bankruptcy estate that owned policy). To

the extent that an interest in property is limited in the hands of the debtor, it is equally limited as property of the estate. This limitation concept is well-established in Section 541(d) ("Property in which the debtor holds . . . only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."). 11 U.S.C. § 541(d). "Although the issue of what property is properly included in the debtor's bankruptcy estate raises a federal question, it is well-settled that a debtor's property rights are created and defined by state law." *In re Fordu*, 201 F.3d 693, 700 (6th Cir. 1999); *see Demczyk v. Mutual Life Ins. Co. (In re Graham Square, Inc.)*, 126 F.3d 823, 827 (6th Cir.1997) ("To determine the extent of an estate's interest in property, we must look to property rights defined under state law."); *see also Nobelman v. American Savings Bank*, 113 S. Ct. 2106, 2110 (1993) ("Congress has 'left the determination of property rights in the assets of a bankrupt's estate to state law,' since such 'property rights are created and defined by state law.'") (*quoting Butner v. United States*, 99 S. Ct. 914, 918 (1979)). Furthermore, property entering the estate remains subject to the limitations imposed by applicable state and non-bankruptcy federal law, unless the Bankruptcy Code pre-empts or overrides such law.

The Sixth Circuit has had limited occasion to consider the contours of whether (or when) insurance proceeds are property of a bankruptcy estate. However, the trend among those circuits to have considered the question is to distinguish between the insurance policy itself, which is unquestionably property of the estate,[9] and policy proceeds, which requires fact-specific

---

[9] *See, e.g.*, *First Fidelity Bank v. McAteer*, 985 F.2d 114 (3d Cir. 1993); *McArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89 (2d Cir.), *cert. denied*, 109 S. Ct. 176 (1988); *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1399 (5th Cir.1987); *Tringali v. Hathaway Machine Co.*, 796 F.2d 553 (1st Cir.1986); *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.1985), *cert. denied*,

analysis.[10] *See In re Louisiana World Exposition*, 832 F.2d 1391, 1399 (5th Cir.1987) ("The question is not who owns the policies, but who owns the liability proceeds. Although the answer to the first question quite often supplies the answer to the second, this is not always so . . . ."). *Matter of Edgeworth*, 993 F.2d 51, 55 (5th Cir. 1993); *In re Endoscopy Ctr. of S. Nevada, LLC*, 451 B.R. 527, 542 (Bankr. D. Nev. 2011) ("[T]he principal threshold question in this case revolves around whether the Policy proceeds that are potentially going to be paid to injured third-parties are property of the Debtors' estates.").

The Fifth Circuit was one of the earliest courts to consider the policy/proceeds distinction in *Edgeworth, supra*, which provides some parallels to the instant case. *See* 993 F.2d at 55. *Edgeworth* involved a physician, whose patient died while under his care. A month later, the physician filed for bankruptcy protection. *Id.* The deceased's family sought to sue Dr. Edgeworth for malpractice in state court, looking only to his medical malpractice insurance proceeds for recovery. *Id.* But, the debtor's medical malpractice liability insurance policy would pay only injured third parties. *Id.* On that basis, the court concluded that Dr. Edgeworth had no equitable interest in the policy proceeds. *Id.* The Fifth Circuit panel noted that the proceeds could not be made available for distribution to creditors other than victims of medical malpractice and their relatives. *Id.* Additionally, the court found that no legitimate secondary impact (discussed further below) would affect the debtor's bankruptcy estate. *Id.* The court concluded that the policy proceeds were not part of the physician's bankruptcy estate and allowed the state court suit to

---

107 S. Ct. 251 (1986); *In re Davis*, 730 F.2d 176 (5th Cir.1984); *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541 (5th Cir.1983).

[10] Several courts have chronicled the evolution of this area of law. *See, e.g.*, *Landry v. Exxon Pipeline Co.*, 260 B.R. 769 (Bankr. D. La. 2001); *Liberty Mutual Insurance Co. v. Official Unsecured Creditors Committee of Spaulding Composites Co., (In re Spaulding Composites)*, 207 B.R. 899 (9th Cir. B.A.P. 1997); *In re Allied Digital Technologies Corp.*, 306 B.R. 505 (Bankr. D. Del. 2004).

proceed. *Id.* The court took pains to distinguish liability policies from policies where the insured/debtor is the beneficiary and has a pecuniary interest in the proceeds of the policy, explaining:

> The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim. When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate. In other words, when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate.
>
> Examples of insurance policies whose proceeds are property of the estate include casualty, collision, life, and fire insurance policies in which the debtor is a beneficiary. Proceeds of such insurance policies, if made payable to the debtor rather than a third party such as a creditor, are property of the estate and may inure to all bankruptcy creditors. But under the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy. Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract.

*Edgeworth*, 993 F.2d at 55–56 (citations and quotations omitted). Expanding on *Edgeworth*'s reasoning, a district court considered certain factors to determine whether insurance proceeds were estate property, noting that "under the *Edgeworth* analysis, the type of insurance at issue is critical for determining whether insurance policy proceeds are included within the estate of the insured/debtor." *Landry v. Exxon Pipeline Co*., 260 B.R. 769, 786 (Bankr. M.D. La. 2001). Analyzing liability insurance specifically, the *Landry* court observed:

> In the liability insurance context, the debtor has no cognizable claim to the proceeds paid by an insurer on account of a covered claim. The proceeds are paid to the victim of the insured's wrongful act. The insured debtor cannot ask the insurance company to pay him, or determine on its own how the proceeds of the policy should be distributed, nor can any creditor of the insured seize the proceeds in satisfaction of a claim not falling within the terms of the insurance contract.

> As pointed out in Edgeworth, the proceeds could not be made available for distribution to the creditors other than those who have claims under the policies . . . . When a covered claim arises, the injured debtor may have an interest, albeit a self-serving interest, in having a third party (the insurance company) pay for its wrongdoing, but this is not a legal or equitable interest **in the property** used to pay the claim. The interest the insured debtor has is the contractual right to have its own assets protected from exposure by means of the insurance coverage, according to the terms of the contract.

260 B.R. at 786–787 (bold in original, footnotes omitted) (citing *Edgeworth*, 993 F.2d at 56). Thus, the court in *Landry* perused (1) whether the debtor could ask the insurance company to pay him, (2) whether the debtor could determine on its own how the proceeds of the policy should be distributed, and (3) whether any creditor of the insured could seize the proceeds in satisfaction of a claim not falling within the terms of the insurance contract. *Landry* answered those queries in the negative, and each factor weighed against including the policy proceeds as property of the estate. 260 B.R. at 783–800; *see also In re Endoscopy Ctr. of S. Nevada, LLC*, 451 B.R. 527, 545-46 (Bankr. D. Nev. 2011) (implementing *Edgeworth* and *Landry* factors). The policy here is a no-fault PIP obligation under Kentucky law. The Court thus looks at the status of such coverage in determining that, at least in the context of the record and allegations in this case, the PIP payment falls outside Chenault's estate.

### C. Applicable Kentucky Insurance Law

To determine whether the instant insurance proceeds were property of the estate, the Court must look to Kentucky insurance law and determine whether, in context, Chenault had a right to the proceeds. The complicating factor, here, is that the at-issue insurance proceeds have the theoretical potential, under Kentucky law, to be both estate and non-estate property, because the insured may or may not be entitled personally to some PIP proceeds when claiming certain

kinds of loss. Both parties agree that the insurance proceeds at issue here are properly considered basic reparation benefits ("BRB"), also referred to as personal injury protection ("PIP") benefits, which is a category of required coverage under Kentucky's statutory insurance scheme, the Kentucky Motor Vehicle Reparations Act (MVRA). *See generally* Ky. Rev. Stat. Ann. § 304.39-010-304.39-350.

> "Basic reparation benefits" mean benefits providing reimbursement for net loss suffered through injury arising out of the operation, maintenance, or use of a motor vehicle, subject, where applicable, to the limits, deductibles, exclusions, disqualifications, and other conditions provided in this subtitle. The maximum amount of basic reparation benefits . . . shall be ten thousand dollars ($10,000) . . . . Basic reparation benefits consist of one (1) or more of the elements defined as "loss."

Ky. Rev. Stat. Ann. § 304.39-020(2).

> "Loss" means accrued economic loss consisting only of medical expense, work loss, [and] replacement services loss . . . . Noneconomic detriment is not loss. However, economic loss is loss although caused by pain and suffering or physical impairment.
>
> (a) "Medical expense" means "reasonable charges incurred for reasonably needed products, services, and accommodations, including those for medical care . . . .
>
> (b) "Work loss" means loss of income from work the injured person would probably have performed if he had not been injured, and expenses reasonably incurred by him in obtaining services in lieu of those he would have performed for income, reduced by an income from substitute work actually performed by him.
>
> (c) "Replacement services loss" means expenses reasonably incurred in obtaining ordinary and necessary services in lieu of those the injured person would have performed, not for income but for the benefit of himself or his family, if he had not been injured.

Ky. Rev. Stat. Ann. 304.39-020(5). Work loss and replacement services loss "may not exceed two hundred dollars" per week claimed.[11] Ky. Rev. Stat. Ann. § 304.39-130. Insurance proceeds for medical expenses may either reimburse the insured for money spent out of pocket or pay medical providers directly. *See Medlin v. Progressive Direct Ins. Co.*, 419 S.W.3d 60, 63 (Ky. Ct. App. 2013). Therefore, under the MVRA scheme, whether the insured has an interest in insurance proceeds depends on which type of loss the proceeds reimburse. Essentially, the insured has a capped right to BRB/PIP proceeds for work loss, replacement services loss, and medical expenses the insured directly paid out of pocket, but not to direct reimbursement for unpaid medical expenses.

Here, Chenault's Complaint allegations and exhibits make it clear, as later discussed, that the insurance proceeds covered only third-party medical expenses. Therefore, limiting the analysis to medical expenses, the Court considers the several factors—(1) whether the debtor could ask the insurance company to pay him, (2) whether the debtor could determine on its own how the proceeds should be distributed, and (3) whether any creditor of the insured could seize the proceeds in satisfaction of a claim not falling within the terms of the insurance contract—that guide whether insurance proceeds are property of the estate. *See Edgeworth*, 993 F.2d at 56; *see Landry*, 260 B.R. at 783-800. Here, the PIP payment reflected a proper, designated, direct reimbursement to UK for healthcare provided by UK to Chenault.

*Direct Payment*

---

[11] Chenault does not allege in the Complaint, and nowhere alleges in the record, that he demanded any PIP be allocated to either of these categories. Per the Complaint and its attachments, State Farm paid $9,800 of the PIP $10,000 maximum to UK for medical expenses incurred relative to the 2015 auto accident. *See Adversary Proceeding*, ECF No. 1-2 (State Farm Explanation of Review).

Where an insured/debtor may ask the insurance company to pay him directly under a policy, that factor weighs toward inclusion of the insurance proceeds in the bankruptcy estate. Under the MVRA, in the medical expense context, the insured is *not* entitled to direct payment, unless he is claiming reimbursement for out of pocket medical expenses he directly paid. In *Medlin*, the Kentucky Court of Appeals rejected arguments (to the contrary) that language in a section of the MVRA outlining the obligor's duty to respond to and timely pay claims (rather than the section that specifically provided the direction right[12]) "entitled [the insured] to receive his PIP benefits directly in order for the insured to pay his medical providers." 419 S.W.3d at 62. That section provides:

> Basic and added reparation benefits are payable monthly as loss accrues. Loss accrues not when injury occurs, but as work loss, replacement services loss, or medical expense is incurred. Benefits are overdue if not paid within thirty (30) days after the reparation obligor receives reasonable proof of the fact and amount of loss realized, unless the reparation obligor elects to accumulate claims for periods not exceeding thirty-one (31) days after the reparation obligor receives reasonable proof of the fact and amount of loss realized, and pays them within fifteen (15) days after the period of accumulation. Notwithstanding any provision of this chapter to the contrary, **benefits are not overdue if a reparation obligor has not made payment to a provider of services due to the request of a secured person when the secured person is directing the payment of benefits among the different elements of loss.** If reasonable proof is supplied as to only part of a claim, and the part totals one hundred dollars ($100) or more, the part is overdue if not paid within the time provided by this section. **Medical expense benefits may be paid by the reparation obligor directly to persons supplying products, services, or accommodations to the claimant, if the claimant so designates.**

---

[12] Ky. Rev. Stat. Ann. § 304.39-241, which provides that "[a]n insured may direct the payment of benefits among the different elements of loss, if the direction is provided in writing to the reparation obligor. A reparation obligor shall honor the written direction of benefits provided by an insured on a prospective basis."

*Id.* at 63 (quoting Ky. Rev. Stat. Ann. § 304.39-210) (emphasis added). In *Medlin*, the insured pointed to the last sentence to argue that the MVRA required an insurer to directly pay the insured for medical expenses, if instructed, even where the insured had not paid anything out of pocket. The court rejected that argument, and instead held:

> The MVRA does not require [insurers] to pay PIP benefits directly to the insured . . . . the only requirements set forth in the MVRA are for [the insurer] either to reimburse the insured for money spent out of pocket or to pay the medical providers directly.

*Id.* at 62.

Chenault did not plead a right to reimbursement of medical loss he paid. The record supports only that he directed State Farm to compensate the involved provider (UK) directly for related medical expenses. That is the lone reasonable suggestion from the State Farm correspondence. Further, Chenault well knew the PIP issue was pending. DE 10-3 (Transcript), at 9. Despite that, in the bankruptcy schedules, Chenault did not identify the PIP policy as an estate asset or allude to any amount owed him under that policy. *See Bankruptcy Proceeding*, ECF No. 1 at 16-17 (Schedules).[13] If Chenault allocated the PIP benefit to medical expenses, he had no further right in the PIP-limited and exhausted proceeds.

### Directing Proceed Distribution

Where an insured/debtor may direct distribution of the proceeds, that factor weighs toward inclusion of the insurance proceeds in the bankruptcy estate. Under the MVRA, this direction right is well established, but limited. The statute provides that the "insured may direct the payment of benefits among the different elements of loss, if the direction is provided in

---

[13] Chenault lists a "State Farm Fire & Casualty Co." policy totaling $50,700, but the at-issue policy is through State Farm Mutual Automobile Insurance Company, *see id*. No. 22-2 at 1 (Letter). Further, he identifies "no" sources of "other amounts someone owes you" such as for outstanding insurance payments or workers' compensation. *Bankruptcy Proceeding*, ECF No. 1, at 16.

writing to the reparation obligor." Ky. Rev. Stat. Ann. § 304.39-241. In *Neurodiagnostics, Inc. v.*

*Ky. Farm Bureau Mut. Ins. Co*., the Kentucky Supreme Court held:

> Upon review, we conclude that the MVRA no longer affords a direct right of action by assignment to medical providers against reparation obligors. Instead**, the control rests with the insured to direct payment of his or her benefits among the different elements of loss.** KRS 304.39–241. This interpretation is consistent with the purposes behind the MVRA of (1) providing prompt payment to victims of motor vehicle accidents (KRS 304.39–010(2)); (2) encouraging "prompt medical treatment and rehabilitation of the motor vehicle accident victim by providing for prompt payment of needed medical and rehabilitation" (KRS 304.39–010(3)); (3) reducing "the need to resort to bargaining and litigation through a system which can pay victims of motor vehicle accidents without the delay, expense, aggravation, inconvenience, inequities[,] and uncertainties of the liability system" (KRS 304.39–010(5)); and (4) helping "guarantee the continued availability of motor vehicle insurance at reasonable prices by a more efficient, economical[,] and equitable system of motor vehicle accident reparations[.]" KRS 304.39–010(6).

250 S.W.3d 321, 325–26 (Ky. 2008), as modified (July 30, 2008) (emphasis added).

So, Chenault would have had an initial designation or allocation right as to the PIP proceeds. That does not mean he could have chosen simply to collect $10,000 for himself. Rather, the PIP limit applies to defined "loss," and the loss categories have sharp boundaries as they pertain to the insured's direct receipt. Although the insured enjoys allocation powers, per *Neurodiagnostics*, a medical provider is an "optional payee" or "incidental beneficiary." 250 S.W.3d at 329. Kentucky law required State Farm to "honor the written direction of benefits provided by an insured[.]" Ky. Rev. Stat. Ann. 304-39.241. Thus, in paying the $9,800 to UK, which exhausted Chenault's PIP remainder, State Farm simply paid out the PIP limit for incurred

and payable charges, per the insured's claim. Again, Chenault does not allege a different loss category, a contrary designation, or cognizable right of direct payment.[14]

*Secondary Impact*

The third factor—whether any creditor of the insured could seize the proceeds in satisfaction of a claim not falling within the terms of the insurance contract—analyzes the "secondary impact" insurance proceeds may have on an estate. Courts that have focused on this factor find the insurance proceeds are property of the estate, because the policy proceeds pay claims that would otherwise need to be paid from the estate assets. *See Endoscopy*, 451 B.R. at 546. Not all courts consider the secondary impact rationale. *See id.* ("[T]o hold that the debtor has a legal or equitable interest in property used to pay the covered claims because payment of the covered claims by some other party with that party's property may decrease the debtor's overall liability, is utterly backward.") (quoting *Landry*, 260 B.R. at 787). The Court need not decide the theoretical secondary impact issue because Chenault's bankruptcy was a no asset Chapter 7 liquidation. In other words, because UK would not receive a distribution via Chenault's estate, the policy proceeds did not pay on a claim that would otherwise be paid from the estate assets. The estate did not rise or fall, even secondarily, because of the UK payment.

Moreover:

> [J]ust because proceeds are considered property of the estate does not mean that such proceeds will necessarily be distributed to all unsecured creditors on a pro rata basis. Courts have recognized that "[p]roperty of the estate comes into the estate subject to all restrictions applicable to that property under state law, unless the restriction is undone by the Bankruptcy Code." *Landry*, 260 B.R.

---

[14] Perhaps the post-payment letter Chenault sent State Farm reflects his misconception of things. Chenault, though not yet discharged via bankruptcy, demanded that State Farm pay him the $9,800 directly. *See Adversary Proceeding*, ECF No. 22-3 ("It's in best interest of this company to forward amount of check ($9,800) to patient."). As explained, that is not how the PIP payment mechanics or rights work.

at 787 n.62 (citing *Board of Trade v. Johnson*, 44 S. Ct. 232 (1924); *Butner v. United States*, 99 S. Ct. 914 (1979)). As a result, "insurance proceeds, if they were considered property of the estate, necessarily would be distributed only to those to whom the state insurance law, or the policies themselves, gave a right to distribution." *Id.*

Richard L. Epling, *et al.*, *Intersections of Bankruptcy Law and Insurance Coverage Litigation*, 21 Norton J. Bankr. L. & Prac. 2 Art. 1 (2012). The MVRA expressly provides that BRB/PIP insurance proceeds for medical expenses are exempt from "garnishment, attachment, execution, and any other process or claim, except upon a claim of a creditor who has provided products, services, or accommodations. Ky. Rev. Stat. Ann. § 304.39-260(1).[15] The upshot is this: PIP benefits would not be accessible to general creditors; the limits are available and subject only to the categories of loss enumerated. Accordingly, no other creditor could seize or pursue the restricted proceeds. This factor weighs against including the State Farm proceeds in estate property.

### D. Entitlement to Proceeds to Reimburse Garnished Wages

The Court now addresses the impact of UK's wage garnishment efforts on the estate property analysis. The Court engages this argument—even not expressly made by Chenault—because Chenault is entitled to *pro se* leniency and the Bankruptcy Court determined complaint amendment would be futile. The Court makes two points on whether Chenault had a priority right to reimbursement for the amount he paid via garnishment. First, Chenault never has contended that he directed State Farm to reimburse his out of pocket expenses (paid via garnishment). In fact, multiple times throughout the hearing, Chenault acknowledged that, even in light of the garnishment efforts, the insurance proceeds could have only gone to UK:

---

[15] The section also provides that "[b]asic reparation benefits other than those for medical expense are exempt from garnishment, attachment, execution, and any other process or claim." Ky. Rev. Stat. Ann. § 304.39-260(2).

The Court:   How does [the fact of the garnishment] prevent UK, the hospital, from receiving a payment from an insurance company for a bill that's still out there?

Chenault:    [M]e and my insurance had a conversation that they wasn't able to send it to UK because UK returned it to them  . . . . [T]hey were going to send it to me to pay the bill that I was getting billed for.
. . .
And it was being garnished for . . .

The Court:   [S]o if we back this all up and the insurance company sent the ten thousand to you tomorrow, you would then just send it to . . .

Chenault:    I would have to pay [UK], yeah . . .

DE 10-3 (Transcript), at 19-20.

The Court:   So how are you personally or your estate . . . entitled to the money? The statutory scheme . . . tells State Farm that it's supposed to pay the medical provider, not you, unless of course you direct it some other way. But you don't say that?

Chenault:    Well, see [State Farm] made an attempt to pay it, like I said, in 2015, when I guess it was Central Kentucky Management or UK—someone returned the check to them. They informed me—they said, we can send it to you to where you can pay it. So I didn't—I was still talking to lawyers, seeing if there was anything else I needed to do . . .
. . .
Before—you know . . .

Court:       . . . And they said . . . they would send it to you but it would be . . .

Chenault:    It would be directed to pay [UK]—yes, sir.

Court:       So I'm still not sure why you should get the money— why it matters that the timing—because the statute still says that UK gets the money.[16] It doesn't say you get the money. So, regardless . . .

---

[16] As indicated in the Bankruptcy Court's line of questioning, "unless you directed otherwise" is, in the context, implied.

<div style="margin-left: 2em;">

| Chenault: | Well, UK no longer owns the debt, though. They turned it over to Kentucky Revenue, which I was paying—being garnished for. |
| --- | --- |

</div>

DE 10-3 (Transcript) at 9. The hearing makes clear that Chenault did not claim he was entitled to the insurance proceeds in the first place (this would be a claim against State Farm), but rather that a function of the bankruptcy discharge entitled him to the proceeds that would otherwise have gone to UK (and, thus, UK's receipt constituted a stay violation). In other words, Chenault feels entitled to the insurance proceeds—despite those being earmarked for medical expenses—because the medical expense debt was forgiven via bankruptcy discharge.

Chenault's line of thinking (though unavailing) emerges through his oral argument at the hearing. Chenault, when pressed by the Bankruptcy Court to identify how he was harmed, stated "I see the harm as . . . if I wasn't entitled to the check, how could they be entitled to the check because the debt was clear—the debt was cleared." DE 10-3 (Hearing), at 21. That position provides insight—lacking in briefing—into Chenault's protests that UK did not attend the § 341 meeting (conduct Chenault sometimes claims is a violation of due process). UK's absence seems to, in Chenault's mind, be evidence that UK did not contest discharge. *See Adversary Proceeding*, ECF No. 30 (Response), at ¶ 6 (accusing UK of "deciding not to appear [at the 341 meeting] or take further action against the discharge of Plaintiff's debt owed . . . ."); *id.* at 10 (stating UK's conduct was a "deliberate attempt to 'back door' the bankruptcy code . . . ."). Chenault, it appears, reasoned that post-discharge, the insurance proceeds—even when directed to cover medical expenses loss—would have no place else to go but into his own pocket. Such reasoning fails. Bankruptcy discharges the debtor's obligation to repay a debt, it does not erase the debt or prevent creditors from collecting from another source. *See, e.g.*, *Bankruptcy*

*Proceeding*, ECF No. 20 (Discharge Order), at 2 ("[T]his discharge does not stop creditors from collecting from anyone else who is also liable on the debt, such as an insurance company . . . .").

Second, even had Chenault so argued, his claim would have been that of breach of contract against State Farm, and not one of automatic stay violation against it. Under the MVRA, UK had no power to instruct State Farm to pay proceeds directly to UK. *Neurodiagnostics*, 250 S.W.3d at 329 (expressly rejecting that a medical provider had any direct right of action against the insurance company and concluding that "[i]f a medical provider does not receive payment from the reparation obligor . . . because benefits have been exhausted . . . then the insured is the party that is ultimately responsible for payment").[17] In directing payments as it did, State Farm could only lawfully have been following Chenault's specific, written instructions. Had Chenault alleged State Farm violated Chenault's instruction, that conduct would amount to a breach of contract claim against State Farm. *See id*. ("[I]t is the insured that has the direct right of action against the reparation obligor if he or she disagrees with the way in which his or her benefits were either paid or not paid.").

Chenault did not make a garnishment-based claim to proceeds.[18] The hearing record shows that, even if he had attempted one, the claim would have been futile. As such, the Court agrees with Judge Schaaf's careful calculus on the estate/proceeds analysis.

### E. Hearing Impact on Dismissal

---

[17] Accordingly, UK's conduct could not amount to the "willful" violation of a stay required to sustain Chenault's claim.

[18] Although the hearing tossed around a $5,000 figure in terms of the garnishment total, the documents Chenault supplied listed a year-to-date 2017 total of only $140.00. *Adversary Proceeding*, ECF No. 30-7. The Court makes no findings on that, but if UK's bill was over $23,000 and the PIP paid only $9,800, Chenault, mathematically, would have no plausible reimbursement right, be it to hundreds or up to $5,000 dollars.

Under Federal Rule of Civil Procedure 15(a), leave to amend a Complaint "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). "'In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Parchman v. SLM Corp.*, 896 F.3d 728, 736 (6th Cir. 2018) (quoting *Foman v. Davis*, 83 S. Ct. 227, 230 (1962). After extensive probing and clarification at oral hearing, the Bankruptcy Court concluded amendment in the instant case would be futile.

District courts "have no obligation to act as counsel or paralegal" to *pro se* litigants. *Pliler v. Ford*, 124 S. Ct. 2441, 2446 (2004). They are also not "required to create" a *pro se* litigant's claim for him. *Payne v. Secretary of Treasury*, 73 Fed. Appx. 836, 837 (6th Cir.2003). "Matters outside of the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." *Weiner v. Klais and Co., Inc.* 108 F.3d 86, 88–89 (6th Cir.1999), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 122 S. Ct. 992 (2002). "[A] court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *See, e.g.*, *Stein v. HHGREGG, Inc.*, 873 F.3d 523, 528 (6th Cir. 2017). Put simply, "if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion . . . [f]airness and efficiency

require this practice." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014). The Bankruptcy Court correctly considered only materials appropriate for the 12(b)(6) stage.

Surveying with caution the applicable record, and giving Chenault a full and fair chance to explain his theories, Judge Schaaf both rejected the pending pleading and assessed whether Chenault could allege a claim by way of amendment. After being satisfied that Chenault did not claim to have directed State Farm differently, and could not claim an inconsistent reimbursement right, given the state of the medical billing and payment history, Judge Schaaf properly decided to dismiss. Chenault had never alleged the PIP policy proceeds as an estate asset and had advocated for payment to UK as far back as 2015. Although it upset Chenault that UK did not attend the § 341 meeting, Judge Schaaf rejected that absence as a due process violation and also recognized Chenault's concession of no measurable harm from UK conduct. For all of those reasons, in the context of assessing potential amendment, Judge Schaaf properly viewed any proposed amendment as futile on this record.[19]

IV.    CONCLUSION

The Bankruptcy Court correctly dismissed Chenault's adversary proceeding. Accordingly, the Court **AFFIRMS** the Bankruptcy Court's Order granting Defendants' Motion to Dismiss.

This 30th day of July, 2019.

Signed By:

**Robert E. Wier**

**United States District Judge**

---

[19] Nor did Chenault make a specific amendment proposal in the hearing. In the Adversary Proceeding brief, he alluded to various constitutional and statutory theories, though none with specific factual allegations. *See Adversarial Proceeding*, ECF No. 30 (Response), at 6-8.